Goodwin v. Franklin, No. 116-5-11 Cacv (Teachout, J., December 20, 2012)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

# STATE OF VERMONT

| | |
|---|---|
| **SUPERIOR COURT** | **CIVIL DIVISION** |
| **Caledonia Unit** | **Docket No. 116-5-11 Cacv** |

**WAYNE GOODWIN and
PAMELA NORRIE,**
    **Plaintiffs**

    **v.**

**FREDERICK G. FRANKLIN,**
    **Defendant**

## DECISION

A final hearing was held on November 14, 2012. Plaintiffs were present and represented by Attorney Maryellen Griffin. Defendant was present and represented himself. Plaintiffs seek damages for loss of water in the residence they rent from Defendant as well as recovery based on a number of related claims.

Based on the credible evidence, the Court makes the following Findings of Fact and Conclusions of Law.

## Findings of Fact

Plaintiffs are tenants of Defendant Frederick Franklin, who owns property in Newark, Vermont. In addition to his own house, Mr. Franklin owns two other houses on his property that he rents out. In June of 2010, Wayne Goodwin and his mother Pamela Norrie rented one of Mr. Franklin's houses on a 10-acre parcel. They had been looking for a place to live in a rural area where they could have animals, and responded to an ad placed by Mr. Franklin that they found attractive. The house consists of two stories and is 20' by 30'. The water for the rental house comes from a well via Mr. Franklin's own house. There is a pump in Mr. Franklin's house, and the water goes from there to the rental house, where there is another pump.

The parties made an oral rental agreement and the Plaintiffs moved in. Their household consists of Mr. Goodwin and Ms. Norrie, Mr. Goodwin's brother Nicholas, Nicholas's girlfriend, and her two children. They keep a beef cow and raise their own food. Both of the Goodwin brothers work as brush cutters, and their mother, Ms. Norrie drives a school bus and works full time as a caregiver for an elderly person.

Five months after the Goodwins ("Tenants") moved in, in November of 2010, they started to lose water. They complained to Mr. Franklin ("Landlord"). From then on, over the last two years from time to time, they have periodically and continuously either had no water at all, or had low water pressure in the house. The length of water outages varies. They routinely notify Landlord, and the water often comes on again, only to go off again on another day. During 2011 and 2012, a Vermont State Trooper was called to

the property on many occasions, and at least six times, he advised Landlord that he was not entitled to shut off the Tenants' water due to nonpayment of rent. Apparently Landlord believed that the Tenants were not paying their rent. Rent receipts show payments of rent through January of 2012, although the evidence did not include details of whether all rent due was paid in full.

In May of 2011, Wayne Goodwin filed this suit based on the water outages. On May 24, 2011, the parties settled the case with a stipulation that became an Order. It provided that Landlord agreed to supply, "without interruption, water sufficient in quantity and pressure to meet the ordinary needs of the occupants." May 24 Order, ¶ 1. Tenants waived claims with respect to past water shut-offs, and Landlord waived past unpaid rent. They agreed on a rental amount going forward, and Mr. Goodwin agreed to perform some repairs. They further agreed that if Landlord violated ¶ 1 or otherwise violated the Warranty of Habitability, Tenants' waiver of past claims was cancelled. Thereafter, Mr. Goodwin did the work agreed upon.

Nonetheless, water shutoffs continued. In late July of 2011, the Town Health Officer inspected the house and issued a Report on August 1, 2011 that stated: "It is really hard to pinpoint what is going on as this water supply comes from a pump at Mr. Franklin's house. I am quite sure Mr. Franklin turns it off & on to cause the Goodwins aggravation because of alleged rent issues."

In August, Tenants filed a Motion to Enforce the Agreement, which was granted on September 20, 2011 after hearing (Gerety, J.). The Court found Landlord in contempt and the Order: 1) required him to provide sufficient water in quantity and pressure, without interruption, to meet ordinary needs; 2) provided for a daily fine of $50 for further violations; 3) provided for payment of Tenants' attorneys fees; and 4) reopened the case pursuant to the May 24, 2011 Stipulation and Order and ordered that it be set for hearing.

Landlord was on probation. His probation officer was contacted many times about the water shutoff problem. In September of 2011, when there was a water outage, Probation Officer Michael Cross followed Landlord into his house and observed him turn on the water system. Shortly thereafter, he verified at the Tenants' house that the water was restored.

Landlord has been consistently clear that the reason he has turned off the water is that he believes that the Tenants have not paid their rent, and that when they do not pay rent they are not 'tenants' and therefore he does not have to provide water. In a letter to Judge Gerety on September 29, 2011 following the hearing on the motion for enforcement of the stipulated order, Landlord wrote: "[W]ater will not be available in ten days which ends Tues, 10-4-11. I provide nothing for liars who don't pay as all other dignified tax paying pillars of society as I, do."

On October 13, 2011, the Tenants filed a Second Motion to Enforce and Contempt. This motion was granted and an Order issued on November 8, 2011 (Gerety, J.), followed by an Order of November 29, 2011 (Gerety, J.) based on a Stipulation and

Agreement, which provided that Landlord would go home "directly and immediately restore water service to the Goodwins."  It further provided that he would, at all times, provide "uninterrupted water sufficient in quantity and pressure to meet the ordinary needs" of Tenants' family, and that if Landlord discontinued or interrupted water service at any time and the fact was verified by specified persons, Landlord would be incarcerated until further order of the Court.  Landlord stipulated that he had the present ability to provide water to the Tenants as required by the agreement.  The Court ordered Landlord to pay sanctions of $1,407.94 for attorney's fees related to the second contempt motion.

On January 17, 2012, Mr. Goodwin wrote to Landlord that the water was off again and sought a resolution.  The final paragraph of the letter stated, "Please get back to me.  If I have not heard from you by February 1, 2012, I will assume that you do not intent to respond and I will take appropriate steps with the Court."  There is no evidence that any steps were taken.

On May 7, 2012, the Court (Gerety, J.) approved a prejudgment attachment in the amount of $30,000.00.  The pattern of periodic water shut-offs continued.  In May of 2012, a Vermont State Trooper was called again when there was no water in the Tenants' home.  Landlord told the trooper that the Tenants were "parasitic maggots."  His probation officer continued to go to Landlord's home, and Landlord referred to the Tenants as "freeloading squatters."  On May 25, 2012, the Tenants filed the Third Motion for Contempt.  In the summer of 2012, on one occasion, Landlord chased Nicholas Goodwin up the road, took a swing at him, and called the members of the family "freeloaders" and "useless squatters."

A hearing was held on the third motion for contempt in September of 2012.  Landlord had notice of the possibility of incarceration for contempt.  He was represented at the hearing by Attorney Daniel Richardson.  The Court found him in contempt for not maintaining the water supply to the Tenants, and he was incarcerated.  He was released at a follow-up hearing so that he could arrange for the restoration of water service.  He was given the opportunity to have the system inspected by a plumber and make necessary repairs to assure quantity and pressure of water to the Tenants' home.  Specific repairs were recommended by a plumber, which he was required to complete by October 12, 2012.  He did not do so, and he continued to shut the water off.  He was incarcerated again on October 31, 2012 and released on November 7, 2012.  The final hearing was scheduled for November 14, 2012.  The water was off the day before and the day of the final hearing on November 14, 2012.  Landlord clearly stated to the Tenants' lawyer: "The thing is, your clients have not paid rent."

As of November 14, 2012, the water supply was either off or low and insufficient in quantity or pressure on 515 days.

In addition to shutting off the water, Landlord has occasionally shut off the power to the rental house.  Nicholas Goodwin has seen him open the electric box and switch the power on or off approximately six times.  The power box has been padlocked and Landlord has cut off the padlock.

The effect of lack of water on the Tenants is that they have no water for drinking, bathing, cooking, doing dishes, or watering their beef cow, "T-Bone." They cannot keep their bodies or clothes clean, and face the humiliation of being dirty and smelly as a result. They have difficulty keeping the toilet free of waste as there is often no water to flush. Ms. Norrie testified that they were normally poor but clean, but the effect of this was to make them "dirty poor." They have to go to gas stations to use the toilet facilities. They have to haul 30–40 gallons of water per week to keep their beef cow alive.

There was testimony that the situation is demoralizing and has contributed to Ms. Norrie becoming depressed and unmotivated. There was no expert testimony that she has a clinical diagnosis of depression. She cannot have her 4 year old and 7 month old grandchildren visit at her home because of the lack of water and the inability to maintain cleanliness.

The evidence is overwhelming that Tenants have suffered for two years not only the lack of a sufficient and reliable water supply and the inconvenience and discomfort that a lack of water entails, but constant uncertainty, annoyance, and resulting humiliation and indignity that comes from not being able to maintain cleanliness.

Landlord testified that he has never purposefully interrupted the Tenants' water supply, "ever," and that "the water is perfect." The Court does not find this testimony credible. He also testified that he only has problems with tenants when they do not pay rent, and that he is being stolen from by the Tenants, who he considers to be "freeloaders."

Landlord has not pursued a legal eviction of the Tenants by following the requirements of the law.

**Conclusions of Law**

Illegal Eviction

Vermont law specifies three types of illegal evictions, one of which is that "[n]o landlord may willfully cause, directly or indirectly, the interruption or termination of any utility service being supplied to the tenant, except for temporary interruptions for emergency repairs." 9 V.S.A. § 4463(a). "Any tenant who sustains damage or injury as a result of an illegal eviction may bring an action for injunctive relief, damages, costs and reasonable attorney's fees." *Id*. § 4464(a).

The evidence shows that from November of 2010, approximately five months after moving into their residence, continuing to the present, Landlord has periodically and persistently interrupted the flow of water to the Tenants' residence to a significant degree. The findings of fact are also clear that Landlord has been acting willfully in interrupting the flow of water to Tenants' residence during this time. Thus, Tenants are entitled to a remedy under § 4464(a). Due to the severity and malicious nature of Landlord's actions, Tenants are entitled to both compensatory and punitive damages. *Villeneuve v. Beane*, 2007 VT 75, ¶ 10, 182 Vt. 575 (recognizing "an exception to the general rule that breach of contract does not support punitive damages when the breach has the character of a

4

wilful and wanton or fraudulent tort, or when the evidence indicates the breaching party acted with actual malice") (citation omitted).

In May of 2011, Tenants filed suit based on the water outages. That suit eventually resulted in a stipulation that became an Order on May 24, 2011 (Gerety, J.). In direct violation of that Order, problems with the flow of water continued, and consequently Landlord has been found in contempt three times, on September 20, 2011 (Gerety, J.), November 8, 2011 (Gerety, J.), and September 7, 2012. The September 20, 2011 Order again required Landlord to supply sufficient flow of water, and further provided for a daily fine of $50 for further violations and the payment of attorney's fees.

Tenants are therefore entitled to compensatory damages for each of the 515 days they were without adequate flow of water to their residence. A reasonable compensatory amount is $50 per day, which is equal to the amount of the fine imposed in the September 20, 2011 Order for further violations. In addition, Tenants are also entitled to $25 per day in punitive damages due to the willful, malicious, and continued actions of Landlord over a two-year period. Although the total amount of punitive damages substantially exceeds those upheld in *Villeneuve*, the nature of the conduct is different. In this case, there has been a long-term, relentless, deliberate campaign of harassment through water shut-offs and reductions in water pressure lasting two years, despite several warnings and opportunities to comply with the law and court orders. Orders to stop the shut-offs and provide sufficient water have been flagrantly violated. In sum, Tenants are entitled to a total of $75 per day in damages for each of the 515 days that they were without sufficient water, for a total of $38,625.00 through November 14, 2012. This daily total amount of $75 is reasonable in relation to the cost that Tenants would have had to pay to stay in motels or other accommodation while their residence was without sufficient water supply, especially considering the number of people in their household.

Tenants are also entitled, pursuant to 9 V.S.A. § 4464(a), to an injunction prohibiting Landlord from tampering with the flow of water going forward, with an additional $75 fine per day where insufficient water is supplied to Tenants' residence. The previous fine of $50 per day was clearly insufficient to deter continuing tampering.

Finally, under 9 V.S.A. § 4464(a) and the September 20, 2011 Order, Tenants are entitled to attorneys fees. Tenants' attorney is ordered to submit an affidavit within 15 days, detailing reasonable attorney's fees. The request shall not include duplication of the $1,407.94 already awarded in sanctions, which shall become part of the judgment in this case. Subsequently, Landlord will have 15 days to object to the reasonableness of the amount.

Warranty of Habitability

Under Vermont law, "in any residential rental agreement, the landlord shall be deemed to covenant and warrant to deliver over and maintain, throughout the period of the tenancy, premises that are safe, clean and fit for human habitation and which comply with the requirements of applicable building, housing and health regulations." 9 V.S.A.

§ 4457(a); *Hilder v. St. Peter*, 144 Vt. 150 (1984). When a landlord does not comply with the requirements, and

> after receiving actual notice of the noncompliance from the tenant . . . the landlord fails to make repairs within a reasonable time and the noncompliance materially affects health and safety, the tenant may:
>
> (1) withhold the payment of rent for the period of noncompliance;
> (2) obtain injunctive relief;
> (3) recover damages, costs and reasonable attorney's fees; and
> (4) terminate the rental agreement on reasonable notice.

9 V.S.A. § 4458(a). "Actual notice" is defined as "written notice hand-delivered or mailed to the last know address." *Id*. § 4451(1). Punitive damages are also allowable. *Hilder*, 144 Vt. at 161, 163. Punitive damages are available when the breach of the Warranty of Habitability "is of such a willful and wanton . . . nature as to make appropriate the award of exemplary damages." *Id*. at 165 (concluding that punitive damages are available where the landlord's consistent disregard for tenant's rights "evince[d] a pattern of intentional conduct . . . for which the term 'slumlord' was surely coined").

Beginning approximately five months after Tenants began their tenancy, Landlord has been in violation of § 4457(a) for failing to provide a premises that is fit for human habitation by continuously and repeatedly interrupting the flow of water to Tenants' rental unit. Landlord has been on actual notice of the water problem since Tenants first began to experience an interruption in their water supply in November, 2010. The flow of water to Tenants' residence has been either off, low, or insufficient in quantity or pressure for a total of 515 days.

These interruptions to the flow of water have been so severe and continuous that they have had a deleterious effect on the mental and physical health of the Tenants and their ability to have water for themselves and their cow. The impact of the lack of water has also resulted in extreme inconvenience to Tenants, forcing them to forego normal social visits as well as to drive to use toilet facilities and to obtain potable water.

For these reasons, Tenants' rental residence has been out of compliance with the Warranty of Habitability for 515 days, from November 2010 to November 14, 2012. Throughout this period, Landlord has been adamant that he is turning off the water to Tenants' residence because he believes they have not paid rent. Further, as the findings of fact clearly show, Landlord is acting in a willful and malicious manner toward Tenants, as he considers them to be "parasitic maggots" and "freeloading squatters." Therefore, Tenants have a right to damages, costs, and reasonable attorney's fees. 9 V.S.A. § 4458(a)(3). Both compensatory and punitive damages have already been provided for as a consequence of Landlord's illegal eviction of Tenants, and therefore the Court will not award duplicative damages. Similarly, the Court has already ordered an injunction and will not enter an additional one. Nonetheless, Plaintiffs have proved

6

breach of the Warranty of Habitability as a second legal basis, in addition to illegal eviction, for the remedies previously provided.

Due to Landlord's breach, Tenants are entitled to the additional remedy of withholding rent pursuant to 9 V.S.A. § 4458(a)(1) "for the period of the noncompliance." On January 17, 2012, Tenants wrote Landlord a letter, informing him that the water was not flowing again, and that absent response by February 1, 2012, Tenants "will take appropriate steps with the Court." There is no evidence that any steps were taken in accordance with this letter. An appropriate step in such a case, however, is to withhold rent. Tenants are thus entitled to withhold rent as of February 1, 2012 until the "period of noncompliance" terminates.

The Court will award reasonable attorneys fees to the extent Tenants' attorney can indicate fees arising out of this particular claim, separate and distinct from the fees arising out of the illegal eviction claim. Tenants' attorney is ordered to submit any such affidavit within 15 days, detailing reasonable attorney's fees for work related to this claim. Subsequently, Landlord will have 15 days to object to the reasonableness of the amount.

<u>Negligence</u>

Under Vermont law, a party may recover damages stemming from negligence in addition to damages resulting from breach of contract, i.e., breach of the Warranty of Habitability. *Willard v. Parsons Hill P'ship*, 2005 VT 69, ¶ 31, 178 Vt. 300 (citing *Favreau v. Miller*, 156 Vt. 222, 229–30 (1991)). "[T]he two actions provide different remedies for different wrongs." *Id.* Unlike an action for breach of the Warranty of Habitability, however, "the law of negligence involves more difficult questions of causation and comes into play only when . . . a plaintiff has sustained a personal injury." *Id.* (citing *Favreau*, 156 Vt. at 230). Here, although it is clear that Landlord's actions caused great distress and inconvenience to Tenants, there is insufficient evidence to support a finding of personal injury. This claim is therefore *denied*.

<u>Consumer Fraud</u>

To make out a claim for consumer fraud pursuant to 9 V.S.A. § 2453(a), a complainant must establish three elements concerning a representation or omission made to a plaintiff: "(1) the representation or omission at issue was likely to mislead consumers; (2) the consumer's interpretation of the representation was reasonable under the circumstances; and (3) the misleading representation was material in that it affected the consumer's purchasing decision." *Jordan v. Nissan N. America, Inc.*, 2004 VT 27, ¶ 5, 176 Vt. 465 (citations omitted). "A landlord can commit a deceptive act prohibited by § 2453(a) when a landlord rents property to a tenant that is in violation of law." *L'Esperance v. Benware*, 2003 VT 43, ¶ 14, 175 Vt. 292 (citing *Bisson v. Ward*, 160 Vt. 343, 351 (1993)). In *Bisson*, the landlords rented an apartment to a tenant knowing that the unit was in violation of health and safety codes because it did not have a certificate of occupancy. *Bisson*, 160 Vt. at 351.

Here, Tenants have made no showing of any false representation or deceptive act by Landlord that was likely to mislead consumers. The interruption in the flow of water started approximately five months after the initiation of the oral lease agreement, not from the outset. Furthermore, as the findings of fact and conclusions of law demonstrate, the interruption to the flow of water was a means of illegal eviction, not fraudulent in nature. Accordingly, this claim is *denied*.

<u>Health Code—18 V.S.A. § 122</u>

Vermont law provides that "any person injured or damaged by a violation [of a rule adopted pursuant to Title 18] may bring an action for equitable relief or damages arising from such violation . . . ." 18 V.S.A. § 122(a). Remedies under this provision "are in addition to any common law or statutory remedies otherwise available." *Id.* § 122(c).

Here, Tenants allege that Landlord violated Vermont Rental Housing Code by not providing "a supply of water sufficient in quantity and pressure to meet the ordinary needs of the occupant(s)." Vermont Health Regulations, Chapter 5, Environmental Health Subchapter 16, Rental Housing Health Code, § III-D(1), *available at* http://healthvermont.gov/regs/Rental_ Housing_Code.pdf. The Code applies to "all rented dwellings." *Id.* § I-C(1). The findings of fact show that Landlord has consistently and repeatedly failed to provide a sufficient supply of water to Tenants residence. The Court concludes that in addition to the damages for illegal eviction, Tenants are entitled to damages of $5 per day for each of the 515 days that Tenants were without "a supply of water sufficient in quantity and pressure," thus bringing the total damages to $80 per day for each of the 515 days.

**ORDER**

Counsel for the Plaintiffs shall prepare a Judgment and Order consistent with the Findings and Conclusions.

Dated at Saint Johnsbury, Vermont, this ___ day of December, 2012.

_____
Hon. Mary Miles Teachout
Superior Court Judge


_____
Hon. Roy C. Vance
Assistant Judge


_____
Hon. William P. Kennedy
Assistant Judge

8